IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 23, 2020 Session

## STATE OF TENNESSEE v. RICKY DALE BREEDEN

**Appeal from the Criminal Court for Union County**
**No. 5256    E. Shayne Sexton, Judge**

_____

### No. E2019-00983-CCA-R3-CD

_____

The Defendant, Ricky Dale Breeden, was convicted by a Union County Criminal Court jury of three counts of rape of a child, a Class A felony, and two counts of aggravated sexual battery, a Class B felony. *See* T.C.A. §§ 39-13-522 (2018) (subsequently amended) (rape of a child), 39-13-504 (2018) (aggravated sexual battery). He was sentenced to an effective ninety-five years for the convictions. On appeal, he contends that (1) the evidence is insufficient to support his rape of a child convictions, (2) the State failed to make a proper election of offenses, (3) the trial court erred in denying his motion for expert funds, (4) the court erred by ordering consecutive service. Although we affirm the Defendant's rape of a child convictions, we reverse the Defendant's convictions for aggravated sexual battery and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Patrick G. Frogge (on appeal), District Public Defenders Conference; Leif Jeffers (at trial), District Public Defender; and Tina L. Sloan (at trial), Assistant District Public Defender, for the appellant, Ricky Dale Breeden.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Jared R. Effler, District Attorney General; Tyler Hurst and Meredith Slemp, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to his sexual abuse of his then-fiancée's daughter. The victim was age five when the abuse allegedly began, age ten when the abuse ended, and age twelve at the time of the trial. The grand jury returned a fourteen-count

indictment, charging twelve counts of rape of a child and two counts of aggravated sexual battery. Before the trial, two counts of rape of a child were dismissed, and after the State's case-in-chief, the trial court granted the Defendant's motion for a judgment of acquittal on four counts of rape of a child. Therefore, at the conclusion of the trial evidence, six counts of rape of a child and two counts of aggravated sexual battery remained for the jury's consideration.

At the trial, Union County Sheriff's Detective Ricky Summers testified that on October 16, 2016, the victim's mother reported sexual abuse allegations and that he referred the victim to the children's hospital and scheduled a forensic interview. He said that after the victim's forensic interview, the victim's mother consented to a search of the home. He said that the Defendant was at the home when deputies arrived to perform the search and that the Defendant consented to the search. Detective Summers said that he collected a sheet covering the sofa, a hand towel found on the sofa, and the victim's bedding.

Detective Summers testified that on October 19, 2016, he interviewed the Defendant at the sheriff's office. Detective Summers said that the Defendant initially denied the sexual abuse allegations but later discussed an incident that the Defendant said occurred two weeks before the interview. At the conclusion of the interview, the Defendant signed a written statement surrounding the incident he described. The statement was read to the jury.

In the statement, the Defendant said that two weeks before the interview, he was sleeping in his bed. He said that he and the victim were home alone. He said that the victim entered his bedroom wearing only her underwear, awakened him, and said "she was gonna make [him] feel better." He said that the victim hugged and kissed him, that he rolled onto his back, that the victim climbed on top of him, and that the victim began "rocking back and forth." He said that his penis came out of his pajama pants, that the victim's underwear was off, that he did not think his penis "went inside her," and that he was unsure if he ejaculated. He denied removing the victim's underwear. He said that afterward, the victim went to the living room to watch television and that he fell asleep. He said that about three or four hours later, he was treated at a hospital for chest pain.

On cross-examination, Detective Summers testified that he had not interviewed the victim but that the forensic interviewer spoke to the victim. After reviewing his file, Detective Summers stated he did not request specific questions be asked during the forensic interview. He said that he spoke to the victim's mother but that the mother did not provide

a written statement because she did not know about any of the incidents until after the victim's disclosure.

Detective Summers testified that on October 16, 2016, he instructed the victim's mother to take the victim to the children's hospital for an examination, that the victim was examined on October 17, and that he did not know the reason for the one-day delay. He said that the last incident occurred two weeks before the victim's disclosure, which he said prevented the collection of "critical evidence." He said the forensic interview occurred on October 18.

Detective Summers testified that the Defendant denied the allegations twice before describing the incident in the statement. Detective Summers said the Defendant, who had an eighth-grade education, could read and write. Detective Summers said that, based upon the forensic interview, the victim's friends would not have had any knowledge of the abuse. He agreed that he did not obtain a written statement from anyone other than the Defendant.

Tennessee Bureau of Investigation Forensic Scientist Jennifer Millsaps testified that she received a sheet and a hand towel from a sofa and the victim's bedding and that she analyzed the items for the presence of semen. She said that the presumptive tests on the items were negative. She explained that a presumptive test meant that "something might be present," not that it was present. She said that a presumptive test was conducted to determine if there was something on the items that could be further analyzed. She said that the negative presumptive test could mean that semen was not present on the items but that sun exposure and washing the items could impact the ability of the test to detect the presence of semen. On cross-examination, Ms. Millsaps clarified that the presumptive tests showed that no semen was detected, not that no semen was present.

The victim testified that the Defendant was her mother's former fiancé and that she met him when she was age four. She was in the seventh grade at the time of the trial. She said that "something" happened with the Defendant that she did not like on the day after her fifth birthday. She said that the Defendant touched her "inappropriately." She said that she was in her bedroom, that the Defendant entered the room, that he "halfway" removed his pants exposing his penis, that he rubbed his penis, and that he "used his private area to rub" her vagina "between the slits." The victim was provided a drawing of a female child. When she was asked to identify the part of the body that the Defendant rubbed with his penis, she circled the vaginal area. She said that she felt "stabbing pains," that she asked the Defendant to stop, that he stopped after "[g]ooey stuff came out," and that he told her to clean herself. She said that the gooey substance had been on her private area and that she used a cloth to clean up. She said that she was on her bed playing a video

game when the Defendant entered her bedroom and that nobody else was home at the time of the incident. She recalled that her mother was at work and that her sister was at school. The victim said she did not attend school on this day because she had an upset stomach. She denied telling anyone about the incident and said she was scared and did not understand what had occurred.

The victim testified regarding a second incident, which she said occurred when she was age seven or eight and when two of her friends were at the home. She said that the Defendant called her into the Defendant and her mother's bedroom, that she complied, that the Defendant had partially removed his pants, that he rubbed his private area, and that he told her to get on the bed. She said she wore black pants and a shirt, that she removed her pants and underwear at the Defendant's direction, and that the Defendant placed her on the bed. She said that he was "halfway" on top of her and had her "legs up" and that he rubbed his "private area" on her private area. She said that he unsuccessfully "tried to get his private area into [hers]." She said she felt "horrible pain." She said that the Defendant did not stop until a gooey substance came out of him, that he told her to clean herself, and that he told her not to tell anyone about the incident. She said that the gooey substance had been on her private area. She said that her sister was in her sister's bedroom and that her friends were in the victim's bedroom at the time of the incident. The victim said that she used a cloth to clean herself, changed clothes, and returned to her bedroom. She recalled telling her friends that the Defendant had wanted to talk to her. She said she did not tell her friends what had occurred because she was scared of what they would think of her.

The victim testified regarding a third incident, which she said occurred after she took a shower. She recalled that her mother was going to take her to the doctor on this day because she was not feeling well. She said that after the shower, the Defendant called her to the sofa in the living room and that he told her not to get dressed. She said that the Defendant only wore a shirt and rubbed his penis. She said that he stood while she lay on the sofa, that he had her put her "legs up," and that he rubbed her private area with his penis. She said that he unsuccessfully attempted to "get his private area into the hole." She said that she felt pain, that she asked him to stop, that he did not stop, and that she cried. She said that the Defendant stopped when the gooey substance came out of him. She recalled that the substance was on her private area and stomach and that she took another shower. She said that she and the Defendant were alone at home during this incident and that her mother arrived after the incident to take her to the doctor. She said that she did not tell her mother what had occurred because she was scared.

-4-

The victim testified about a fourth incident, which she said occurred in the Defendant and her mother's bedroom. The victim said the Defendant placed a towel on the bed and rubbed a "clearish blue" lotion on his penis. She said that he rubbed his penis on her private area, that it was "freezing," that she felt pain, and that he told her "to let him in." She said it felt as though "something [was] sticking into [her]." She denied knowing at the time of the incident what the Defendant meant and said it felt as though the incident lasted "forever." She said that the Defendant's penis did not enter her vagina, although he attempted to insert it. She said the gooey substance came out of the Defendant's penis and onto her private area and stomach. She said that she cleaned herself in the bathroom with a cloth and placed it in the laundry room. She said that when she used a cloth, she usually placed it in the laundry room. She said she was age seven or eight at the time of this incident.

The victim testified about a fifth incident, which she said occurred when her sister was asleep. The victim said that the Defendant called her into his and her mother's bedroom because the Defendant thought the victim's sister was in a deep sleep. The victim said the Defendant partially removed his pants, began rubbing his penis, and told her to remove her clothes. She said that she lay halfway on the bed, that the Defendant stood, and that he rubbed his penis on her private area. She recalled that she felt pain, although he did not attempt to insert his penis inside her vagina. She said that the Defendant stopped when her sister knocked on the door, which the Defendant had locked. She said the Defendant told her to dress in the bathroom, that he opened the bedroom door while she was in the bathroom, that the victim's sister asked about the victim's whereabouts, and that the Defendant told the victim's sister that he did not know. The victim said that her sister left the bedroom and that the Defendant told the victim to leave the bedroom. She did not recall when this incident occurred, her age at the time, or the time of year.

The victim testified about a sixth incident, which she said occurred in the Defendant and her mother's bedroom. She said the Defendant called her into the bedroom. She said that the Defendant lay naked on the bed, that he pushed her head down, and that he told her to put her mouth on his penis. She said he did not instruct her to undress. She said that the Defendant's penis entered her mouth and that the gooey substance came out of his penis and onto her face and shirt. She said she did not tell anyone about the incident because she was scared. She did not recall when this incident occurred or her age at the time.

The victim testified about a seventh incident, which she said occurred when her mother was asleep on the sofa. The victim said that the incident occurred after 3:00 p.m. but before the evening hours. She said that the Defendant called her into his and her mother's bedroom, that he closed the bedroom door, and that he lay on the bed. She said

that the Defendant pushed her head down and forced her to lick his penis. She said that his penis entered her mouth and that the gooey substance came out of his penis, into her mouth, and onto her shirt. She said that the Defendant told her to clean herself and not to wake her mother. The victim said she did not recall her age at this time.

The victim testified that about an eighth incident, which she said occurred one week before she disclosed the abuse. She said that she missed two days of school because she did not feel well. She recalled that it was fall, possibly mid-September, and that she was in the fifth grade. She said that her mother was at work and her sister was at school at the time of this incident. She said that the Defendant called her into his and her mother's bedroom in the morning hours and that the Defendant rubbed his penis and told her to get on the bed. She said that the Defendant wore pants and a shirt but that his penis was exposed. She said that the Defendant rubbed his penis on her private area and that he "tried to get" his penis "inside the hole." She said that she knew this because "every time that he tried, it always hurt and it still kept on hurting." She recalled that she lay on the middle of the bed, that the Defendant held up her legs, and that he touched her breasts below her shirt. She said that the gooey substance came out of the Defendant's penis and onto her. She said that the Defendant told her to clean herself, that she cleaned herself with a cloth in the bathroom, and that she placed the cloth in the laundry room.

The victim testified that a ninth incident occurred during the same two-day period she was out of school. She said that the Defendant called her into his and her mother's bedroom sometime in the morning hours of the second day, that the Defendant stood, that he wore pants and a shirt, and that his penis was exposed. She said that the Defendant told her to get on the "edge of the bed," that she lay halfway on and off the bed, and that he held her legs. She said that he rubbed his penis on her vagina and attempted to insert his penis into her vagina. She said this was painful. She said that the Defendant touched her breasts above her clothes during the incident. She said that the gooey substance came out of the Defendant's penis and onto her vagina. She said that later this same day, the Defendant called her to his and her mother's bedroom, that the Defendant pushed her head down, and that he "had" her place her mouth on his penis. She recalled that the Defendant's penis went "up to [her] teeth." She said the Defendant lay on the bed, that he was not wearing pants, and that the gooey substance came out of his penis after he kissed her on the lips. She said she smelled alcohol and cigarettes. She said that the Defendant did not touch her anywhere else during this tenth incident.

The victim testified that on Sunday about one week after the incidents occurring when she was home from school for two days, she decided to tell her mother about the abuse. She said that Friday before she told her mother, she attempted suicide because of

-6-

"all the stress" and because she blamed herself. She said that her mother arranged for her to speak with the church youth pastor and his wife and that the victim disclosed the abuse to them. The victim said that the pastor and his wife told the victim's mother about the abuse.

The victim testified that the Defendant gave her money and bought her things she needed or wanted in exchange for her not telling anyone about the abuse. She denied, though, that the Defendant threatened her.

On cross-examination, the victim testified that she had known the Defendant a couple of months before he moved into their home. She said it was daylight when the first incident occurred on the day after her fifth birthday. She did not recall what clothes she and the Defendant wore at the time of the first incident. Relative to the second incident she described, she said that her friends were at the home for a sleepover and that the incident occurred "about evening" and when her mother was at the grocery store. The victim was unsure if the Defendant locked the bedroom door. She said that after this incident, she put on clothes that had been inside the dryer. She said her friends noticed she wore different clothes when she returned to her bedroom.

The victim testified that before the third incident she described occurred, she took a shower in her bathroom, that her mother was at work, and that her mother planned to return home in order to take her to the doctor. She did not recall her age or grade level at this time but said this incident occurred after the sleepover with her friends.

The victim testified that the incident involving the lotion occurred during the daylight hours. She said that she stayed home with the Defendant frequently during the day but that her mother was home at night. The victim said that she told the forensic interviewer about the lotion and where the Defendant stored it. She said that her mother and sister usually did the laundry but that the Defendant did the laundry after she used a cloth to clean herself after the incidents. She clarified that she placed the cloths on a pile of clothes, not inside the washing machine.

The victim testified that her sister was home when the incident occurred while her mother slept on the sofa. The victim said that her mother awoke after the incident. Relative to the first incident occurring during the two days she was home from school, she said that her mother and sister had been gone from the home for about three hours. She said that her mother called to check on her but that she did not recall the time.

The victim testified that the Defendant stayed in his bedroom frequently because he was sick but that she was unsure of his specific health conditions. She said that when she and the Defendant were home alone, her mother called to check on her. The victim said that she had always been a good student. She recalled that Dr. Nease at Cherokee Health Systems treated her for a period of time. When asked if she recalled telling Dr. Nease that she was concerned about the Defendant's health, she said that Dr. Nease "usually discuss[ed] stuff with [her mother], and [the victim] didn't want to put up any suspicion that [it] was happening or make [her mother] feel upset about herself." She agreed she referred to the Defendant as Dad. She agreed she told Dr. Nease that she was concerned the Defendant and her mother would end their relationship and that she did not want this to happen. The victim explained that if the Defendant and her mother ended their relationship, the Defendant would "hurt" others and that she did not want him to hurt anyone else. She agreed that she and her sister argued just before the victim attempted suicide.

The victim testified that she told the forensic interviewer about the last two incidents occurring when she was home from school for two days. Although she did not dispute that she told the forensic interviewer these incidents occurred on the sofa in the living room, she stated that the incidents on those two days occurred in the Defendant and her mother's bedroom and on the sofa. On redirect examination, the victim stated that her grades remained good during the abuse because school was a distraction allowing her to forget.

Dr. Rita Westbrook, Director of Pediatric Urgent Care at East Tennessee Children's Hospital and an expert in general pediatric medicine, testified that she had performed hundreds of pediatric examinations on children who had disclosed sexual abuse. She explained the procedure for the physical examination and said a rape kit was not utilized if sexual abuse occurred more than seventy-two hours before the examination.

Dr. Westbrook testified that she examined the victim in October 2016. She said that the victim was nervous but cooperative, that the victim's external vaginal examination was "normal," and that she did not observe any bruising, tears, or scar tissue. She observed a small amount of white discharge, which she said was normal for someone the victim's age. Dr. Westbrook said that she did not observe any trauma and that, as a result, she concluded that an internal examination was unnecessary. Her report was received as an exhibit.

Dr. Westbrook testified that she rarely found signs of physical trauma after a child disclosed sexual abuse. She said research showed that children displayed evidence of trauma in less than three percent of abuse cases. She said that in cases in which a child suffered trauma, it healed quickly. She said the likelihood of observing trauma after

twenty-four to seventy-two hours was "slim." She said that children healed within twenty-four hours generally but that the range was three to ten days. She said that it was "very possible" for a child to have a normal examination without evidence of trauma if a person had unsuccessfully attempted to penetrate the child's vagina. She said that without "full penetration, you would not expect to have a lot of trauma." She said that the vaginal "region" healed fast and that the area did not scar easily.

On cross-examination, Dr. Westbrook testified that the history obtained was inconsistent about when the incidents of sexual abuse occurred. She agreed the report included conflicting information relative to the number of days that had elapsed since the victim had been alone with the Defendant. Dr. Westbrook agreed that the report reflected four days but also ten days. Dr. Westbrook said that whether it was four or ten days, too much time had elapsed to utilize a rape kit. She said the victim reported incidents of sexual abuse by the Defendant the previous couple of years. Dr. Westbrook said that the hymen could remain intact with regular penile-vaginal intercourse but that she would "expect some scarring somewhere or something abnormal" if a child were five years old at the time of the initial sexual intercourse. Dr. Westbrook said that the victim's hymen did not have tears or "notching." Dr. Westbrook said that she was not advised that the victim had attempted suicide.

Dr. Westbrook testified that if a person reported engaging in sexual intercourse between ages five and eleven, she would not expect to observe evidence of trauma in the majority of cases. She could not conclude that a person had been sexually assaulted without physical findings, such as a sexually transmitted infection, pregnancy, and vaginal tears.

On redirect examination, Dr. Westbrook testified that the victim was prepubertal at the time of the examination, that prepubertal and adult vaginas were different, and that the victim's vagina had less "redundant tissue," a smaller vaginal opening, and increased secretions. Dr. Westbrook said that it was difficult to insert an object into a prepubertal vagina because decreased hormones prevented lubrication and expansion of the vaginal canal.

Roxanne Patterson, Student Services Supervisor for Union County Schools, testified that the victim's attendance record for the 2016-2017 academic year reflected she left school early on August 18, that she was absent on August 19, and that the victim's mother provided a note for the August 19 absence. The victim's attendance record also reflected that the victim was absent on September 16 and that a doctor's note from "Cherokee" was provided to the school. Ms. Patterson stated that between October 3 and

October 7, the victim had excused absences for treatment at "Reliant Health" and the children's hospital.

Lisa Daniels testified that she, her husband, and the victim's family attended the same church. She said that in October 2016, she and her husband, who was the youth pastor, spoke with the victim after church services. Ms. Daniels recalled that the victim was upset and cried, that her husband walked away to give her and the victim the opportunity to talk openly, and that the victim ultimately told her what had occurred during the past several years. Ms. Daniels said that she spoke with her husband and her father-in-law, who was the church pastor, that they decided to contact the victim's mother, that they informed the victim's mother of the abuse allegations, and that they contacted law enforcement. Ms. Daniels said that the victim's mother was surprised by the allegations, asked the victim questions, and believed the victim.

On cross-examination, Ms. Daniels testified that before she spoke to the victim at the church, she had not interacted much with the victim. Ms. Daniels said that she had known the victim but had not known her personally. Ms. Daniels recalled that her conversation with the victim occurred in October 2016 because Ms. Daniels had learned in late September that her son had been sexually abused by a younger family member. She said that the victim did not mention having attempted suicide. Ms. Daniels stated that the abuse allegations were reported to law enforcement on the telephone and that the officer advised the victim's mother what to do next.

The victim's mother testified for the defense that she and the Defendant began a romantic relationship sometime after September 2011. Although she did not recall the date, the Defendant moved into her home. She said that the victim was born in 2006, and that the victim's fifth birthday was in 2011. The victim's mother did not recall providing a police statement, although she consented to the search of her home.

Jimmy Langley, General Manager of Luttrell-Blaine-Corryton Utility District, presented utility records from the home at which the Defendant lived before moving into the victim's mother's home. The records were received as an exhibit. Mr. Langley testified that the records showed that on March 21, 2012, the Defendant's utility bill was sent to the victim's mother's address.

Upon this evidence, the jury acquitted the Defendant of three counts of rape of a child. The jury found the Defendant guilty of three counts of rape of a child and two counts of aggravated sexual battery, all of which stemmed from the last three incidents described by the victim. The trial court imposed consecutive sentences of twenty-five years for each

rape of a child conviction and ten years for each aggravated sexual battery conviction, for an effective ninety-five-year sentence at 100% service. This appeal followed.

## I. & II.   Sufficiency of the Evidence and Election of the Offenses

The Defendant contends that the evidence is insufficient to support his rape of a child convictions because the victim denied that penetration occurred in these incidents. In a similar issue, the Defendant contends that he was denied his constitutional right to a unanimous jury verdict because the prosecutor failed to make an election of the offenses. The Defendant, likewise, argues that the prosecutor's closing argument did not satisfy the election requirement. He concedes that he did not litigate the election issue in the trial court proceedings and requests that this court review the issue for plain error. The State responds that the evidence is sufficient to support the rape of a child convictions. Likewise, the State responds that the Defendant is not entitled to plain error relief because any error resulting from the prosecutor's failure to elect the offenses was harmless beyond a reasonable doubt.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought, and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988);

-11-

*State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask [for] a conviction, then the court cannot be assured of a unanimous decision." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993).

> This election requirement . . . ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). The critical reason, however, for the election is to protect a defendant against "patchwork verdicts." *Shelton*, 851 S.W.2d at 137.

> [T]he election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are unable to identify the exact date on which any one act was perpetrated.

*State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001) (citing *State v. Brown*, 992 S.W.2d 389 (Tenn. 1999)). "[T]he State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction." *Id.* (citation omitted). "If a jury is allowed to convict without specific evidence supporting the election, then the election is superficial and meaningless." *State v. Johnny Lee Hines*, No. 01C01-9709-CC-00405, 1999 WL 33107, at *4 (Tenn. Crim. App. Jan. 27, 1999). "The offense must be proven in accordance with the election, i.e., to have occurred on [the elected] date and under [the] circumstances." *State v. Marvin D. Nance*, No. E2005-01623-CCA-R3-CD, 2007 WL 551317, at *6 (Tenn. Crim. App. Feb. 23, 2007) (citing *Johnny Lee Hines*, 1999 WL 33107, at *6), *perm. app. denied* (Tenn. May 14, 2007). Relative to an election of offense,

> [T]he standard for sufficiency of the evidence applies to the designation of offenses as though it were an element of the offenses. Not only must the [S]tate's election identify and distinguish offenses sufficiently to allow the

-12-

trier of fact to render discrete and unanimous verdicts on each, the [S]tate must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

*Johnny Lee Hines*, 1999 WL 33107, at *4.

## A.     Sufficiency of the Evidence

### 1.     Rape of a Child

"Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522. Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, *however slight*, of any part of a person's body . . . into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id.* § 39-13-501(7) (2018) (emphasis added).

The record reflects that the Defendant's rape of a child convictions relate to the last three incidents occurring during the two-day period the victim was home from school when she did not feel well and shortly before she disclosed the abuse. The remaining incidents described by the victim were not the subject of the conviction offenses. The victim testified that these three incidents occurred in the fall, possibly September during the fifth grade and when her mother was at work and her sister was at school.

Relative to the first incident for which the Defendant was convicted of rape of a child, the victim testified that the Defendant called her into his and her mother's bedroom in the morning hours. When she arrived at the bedroom, the Defendant rubbed his penis and told her to get on the bed. She recalled that the Defendant wore pants and a shirt but that his penis was exposed. As the victim lay on the middle of the bed, the Defendant rubbed his penis on her private area. The victim stated that he unsuccessfully attempted to insert his penis into her vagina, and she described pain "every time that he tried, it always hurt and it still kept on hurting." The Defendant held up her legs and touched her breasts below her shirt. The Defendant ejaculated and told the victim to clean herself.

Viewed in the light most favorable to the State, the evidence is sufficient to support the Defendant's conviction for rape of a child. Although the victim testified that the Defendant unsuccessfully attempted to insert his penis into her vagina, she described pain during the incident. The victim was in the fifth grade at the time of the incident. Dr. Westbrook testified that it was difficult to insert an object into a prepubertal vagina because decreased hormones prevented lubrication and expansion of the vaginal canal. Based upon

-13-

this evidence, the jury could have reasonably inferred that penetration, however slight, occurred.

Relative to the second incident, the victim testified that the Defendant called her into his and her mother's bedroom sometime in the morning, that the Defendant stood, that he wore pants and a shirt, and that his penis was exposed. The Defendant told her to get on the edge of the bed. She lay partially on the bed, and the Defendant held up her legs. The Defendant rubbed his penis on her vagina and attempted to insert his penis into her vagina. She described pain during the incident. The Defendant touched the victim's breasts above her clothes during the incident, and he ejaculated on the victim's vagina. Viewed in the light most favorable to the State, the evidence is sufficient to support the Defendant's conviction for rape of a child.

Relative to the third incident, the victim testified that the incident occurred later on the same day as the second incident. The Defendant called the victim to his and her mother's bedroom, the Defendant pushed the victim's head down, and "had" her place her mouth on his penis. The Defendant's penis entered the victim's mouth "up to [her] teeth." The Defendant lay on the bed, was not wearing pants, and ejaculated after kissing the victim on the lips. Viewed in the light most favorable to the State, the evidence is sufficient to support the Defendant's conviction for rape of a child.

### 2.      Aggravated Sexual Battery

Although the Defendant has not specifically challenged the sufficiency of the evidence of his aggravated sexual battery conviction, we consider the evidence in light of his contention that the State failed to make an election of the offense. "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [who is] less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4). Sexual contact is defined as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate areas of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id.* § 39-13-501(6) (2018).

The record reflects that the Defendant's aggravated sexual battery convictions relate to the Defendant's touching the victim's breasts during two of the three incidents resulting in rape of a child convictions that occurred during the two-day period she was home from school. The victim testified that during the first of these incidents, the Defendant held up her legs, touched her breasts below her shirt, and ejaculated. The victim testified that during the second incident, which occurred the next day, the Defendant told her to get on the edge of the bed. The Defendant held up her legs, touched her breasts above her clothes, and ejaculated. Viewed in the light most favorable to the State, the evidence is sufficient

to support the Defendant's two convictions for aggravated sexual battery. We will now consider the election of the offenses.

## B. Election of the Offenses

As a preliminary matter, the Defendant concedes that he did not litigate the election of the offenses issue in the trial court proceedings. As a result, our review is limited to plain error. Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); *see also State v. Minor*, 546 S.W.3d 59, 70 (Tenn. 2018). All five factors must exist in order for plain error to be recognized. *Smith*, 24 S.W.3d at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

Although the State presented evidence of multiple offenses that would have satisfied the allegations contained in the indictment, the record does not reflect that the trial court, the prosecutor, and trial counsel discussed the State's requirement to make an election of the offenses. Furthermore, the parties agree on appeal that the State failed to elect the offenses.

Our supreme court has stated,

> The election doctrine refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt. The election must be made at the conclusion of the State's case-in-chief. The election requirement "augment[s] the general unanimity instruction" and serves to ensure that the jury understands its obligation to agree unanimously that the defendant committed the same

-15-

criminal act before it may convict the defendant of a criminal offense. Were the State permitted to present proof of many criminal acts that all allegedly occurred within the time period covered by the charging instrument, but not required to make an election of offenses, juror unanimity would be compromised because nothing would prevent jurors from "reach[ing] into the brimming bag of offenses and pull[ing] out one for each count."

The election doctrine also assists the defendant in preparing for and defending against the specific charge, protects the defendant from double-jeopardy concerns, "enables the trial judge to review the weight of evidence in its role as thirteenth juror[, and] enables an appellate court to review the legal sufficiency of the evidence." Nevertheless, as this Court has previously emphasized, the most important purpose served by the election of offenses doctrine is to "ensure that the jurors deliberate over and render a verdict based on the same offense . . . ."

*State v. Qualls*, 482 S.W.3d 1, 9-10 (Tenn. 2016) (internal citations omitted). As a result, we conclude that the State's failure to elect the particular offense for which each conviction was sought and the trial court's failure to instruct the jury consistent with an election made by the State resulted in error. However, we must determine whether the error is harmless beyond a reasonable doubt. *See State v. Adrian Keith Washington*, No. M2008-01870-CCA-R3-CD, 2010 WL 653008, at *6 (Tenn. Crim. App. Feb. 24, 2010) (stating that the failure to elect the offenses and to provide an adequate jury instruction regarding the election "may be harmless 'where the prosecutor provides during closing argument an effective substitute for the missing instruction'") (internal citation omitted), *perm. app. denied* (Tenn. Aug. 26, 2010); *State v. James Arthur Kimbrell*, No. M2000-02925-CCA-R3-CD, 2003 WL 1877094, at *23 (Tenn. Crim. App. Apr. 15, 2003); *State v. Michael J. McCann*, No. M2000-02990-CCA-R3-CD, 2001 WL 1246383, at *5 (Tenn. Crim. App. Oct. 17, 2001), *perm. app. denied* (Tenn. Apr. 1, 2002).

The record reflects that the trial court provided the following jury instruction regarding the charged offenses:

The Court charges you that before a guilty verdict as to any count of the indictment is justified, the jury must unanimously find evidence beyond a reasonable doubt that the defendant committed a single act of criminal conduct for each offense charged. The State has alleged the following acts for each count:

. . . .

-16-

In count five: At the defendant's residence between September 26, 2016, and October 7, 2016, the defendant's penis penetrated the victim's vagina.

In count seven: At the defendant's residence between September 26, 2016, and October 7, 2016, the defendant's penis penetrated the victim's mouth.

In count nine: At the defendant's residence between September 26, 2016, and October 7, 2016, the defendant touched the victim's breasts with his hand.

In count ten: At the defendant's residence between September 26, 2016, and October 7, 2016, the defendant's penis penetrated the victim's vagina.

In count [fourteen]: At the defendant's residence between September 26, 2016, and October 7, 2016, . . . the defendant touched the victim's breasts with his hand and/or mouth.

Again, the jury must unanimously agree beyond a reasonable doubt that the defendant committed a single act for each offense charged.

## 1. Rape of a Child

Relative to the three counts of rape of a child for which the Defendant was convicted, the prosecutor stated the following during closing argument:

Count five. She told you about when she was sick in the fall of 2016, and she was home from school because her mom was at work and her sister was at school, she was left in the care of the defendant. And that in the morning that he had asked her to come into the room and that he penetrated her on his bed, but that she was – had . . . part of her body on the bed and part of her body was off the bed and being held by the defendant as he tried to, I think she said, get it in the hole. She said it was painful and said the gooey stuff went over her private area, and he told her to go clean up.

Count seven. She also told you that he -- during that same time period that he put his penis in her mouth, that he forced her head down and that it went just past her teeth. She also told you that he touched her breasts over her clothes while he did this. That count is aggravated sexual battery. You go back and look at the definition of aggravated sexual battery . . . .

Count ten. She said while she was home from school in the care of the defendant that again, he called her into the room. I think she said . . . that he called her into the room, his bedroom, that -- she said, laid on her in the middle of the bed, took off her clothes again and tried again put his private area into hers. And again, she said . . . it was very painful. Because what the defendant was doing was placing his penis into her vaginal opening and trying to force it in there. . . .

The record reflects that each count of rape of a child occurred during the two days the victim was home from school during the fall of her fifth-grade year because she did not feel well and when her mother was at work and her sister at school. With regard to Count 5, the victim testified that in the morning hours of the second day, the Defendant called her into his and her mother's bedroom sometime in the morning. The Defendant stood, wore pants and a shirt, and exposed his penis. The Defendant told her to get on the edge of the bed and held up her legs. The victim recalled that she lay partially on and off the bed during the incident. The victim said that the Defendant "tried to get [his penis] into the hole." The victim described experiencing pain during the incident. The Defendant touched her breasts above her clothes, and he ejaculated onto the victim's vagina. We conclude that in light of the State's closing argument, the lack of a formal election and jury instruction relative to Count 5 was harmless beyond a reasonable doubt. The prosecutor's closing argument effectively elected the specific incident for which the State sought a conviction.

With regard to Count 7, the victim testified that in the afternoon on the second day, the Defendant called her to his and her mother's bedroom. During this incident, the Defendant pushed the victim's head down and "had" her place her mouth on his penis. The victim said that the Defendant's penis entered her mouth "up to [her] teeth." The victim recalled that the Defendant lay on the bed and was not wearing pants. The Defendant ejaculated after kissing the victim. Although the evidence did not establish that the Defendant touched the victim's breasts above or below the victim's clothes during this incident as stated by the prosecutor in closing argument, the victim only described one incident of oral penetration during the time period alleged for the conviction offenses. As a result, we conclude that in light of the State's closing argument, the lack of a formal election and a jury instruction relative to Count 7 was harmless beyond a reasonable doubt. The prosecutor's closing argument effectively elected the specific incident for which the State sought a conviction.

With regard to Count 10, the victim testified that in the morning hours on the first day she was home from school, the Defendant called her into his and her mother's bedroom and that the Defendant rubbed his penis and told her to get on the bed. She recalled that she lay on the middle of the bed. The Defendant rubbed his penis on her private area and attempted to insert his penis into her vagina. The victim recalled that the Defendant held

up her legs and touched her breasts below her shirt. The Defendant ejaculated and told the victim to clean herself. We conclude that in light of the State's closing argument, the lack of a formal election and jury instruction relative to Count 10 was harmless beyond a reasonable doubt. The prosecutor's closing argument effectively elected the specific incident for which the State sought a conviction.

Therefore, we conclude that although the State's failure to elect the offenses for which rape of a child convictions were sought and the trial court's failure to provide an instruction consistent with an election resulted in error, the error was harmless beyond a reasonable doubt, given the prosecutor's closing argument. The Defendant is not entitled to plain error relief in connection with his rape of a child convictions.

## 2.    Aggravated Sexual Battery

The record reflects that the prosecutor did not refer during the closing argument to the indictment counts when discussing the aggravated sexual battery allegations in Counts 9 and 14. However, when discussing the rape of a child allegation in Count 7, the prosecutor stated that, based upon the victim's testimony, the Defendant touched the victim's breasts above her clothes when he forced his penis inside the victim's mouth. The prosecutor, likewise, stated later in the argument that the victim testified that the Defendant also touched the victim's breasts below her clothes. The prosecutor did not elaborate on the circumstances surrounding the aggravated sexual battery allegations.

The record reflects that the victim testified that the rape of a child incident described by the prosecutor relative to Count 7 occurred on the second day in the afternoon when she was home from school for two days. The Defendant called her to his and her mother's bedroom, pushed her head down, and "had" her place her mouth on his penis. The Defendant's penis entered the victim's mouth "up to [her] teeth." The Defendant lay on the bed, was not wearing pants, and ejaculated after kissing her on the lips. The victim said that the Defendant did not touch her anywhere else during this incident.

As a result, this testimony is inconsistent with the prosecutor's closing argument that the Defendant touched the victim's breasts above her clothes during the incident involving oral penetration during the relevant time frame. To the contrary, the evidence reflects that the victim testified that the Defendant touched her breasts above her clothes during the incident occurring in the morning hours on the first day she was home from school for two days. The victim said that the Defendant called her into his and her mother's bedroom sometime in the morning, that the Defendant stood, that he wore pants and a shirt, and that his penis was exposed. The Defendant told her to get on the edge of the bed, and she lay partially on and off the bed while he held up her legs. The victims stated that he rubbed his penis on her vagina and attempted to insert his penis "into the hole." During this incident, the Defendant touched the victim's breasts above her clothes and ejaculated.

The only incident in which the victim stated the Defendant touched her breasts over her clothes corresponds to the incident of rape of a child in Count 5. Count 7 involved the incident of oral penetration, and the victim did not testify that the Defendant touched her breasts in any fashion.

Relative to the second incident of aggravated sexual battery, the prosecutor stated in the closing argument that the incident involved the Defendant's touching the victim's breasts below the victim's clothes. The prosecutor did not elaborate about the circumstances of the incident. The record reflects that the victim testified about a single incident in which the Defendant touched her breasts below her clothes. The victim testified that in the morning hours on the first day of the two-day period in which the victim was home from school, the Defendant called her into his and her mother's bedroom and that the Defendant rubbed his penis and told her to get on the bed. The victim lay partially on and off the bed, and the Defendant exposed his penis. The Defendant rubbed his penis on her private area, and "tried to get" his penis "inside the hole." The victim recalled that during the incident, the Defendant held up her legs and touched her breasts below her shirt. The Defendant ejaculated and told the victim to clean herself. As a result, the only incident in which the Defendant touched the victim's breasts below her clothes occurred during the rape of a child alleged in Count 10.

However, the trial court's instructions regarding the two counts of especially aggravated battery further complicate matters. The court instructed the jury that Count 9 alleged aggravated sexual battery involving the Defendant's touching the victim's breasts with his hand and that Count 14, alleging aggravated sexual battery, involved the Defendant's touching the victim's breasts with his hand and/or mouth. The trial evidence did not establish that the Defendant touched the victim's breasts with his mouth during any of the incidents. Furthermore, the jury instructions regarding these allegations do not effectively distinguish between the two incidents of aggravated sexual battery. As a result, we cannot conclude that the jury could have reached a unanimous verdict regarding the aggravated sexual battery allegations in Counts 9 and 14. *See Shelton*, 851 S.W.2d at 138. We conclude that the failure to elect the offenses, along with the trial court's failure to provide an instruction consistent with an election and the evidence, was reversible error. The prosecutor did not connect either incident of touching the victim's breasts to any specific count in the indictment alleging aggravated sexual battery. Likewise, the prosecutor's closing argument relative to the incident involving oral penetration was inconsistent with the trial evidence, and the instruction provided by the trial court for at least one count of aggravated sexual battery was inconsistent with the trial evidence. Furthermore, the court's instructions did not distinguish between touching the victim's breasts above and below her clothes as the trial evidence established. Although the evidence is sufficient to support two convictions for aggravated sexual battery, we reverse the Defendant's convictions as a matter of plain error and remand the case to the trial court

for a new trial on Counts 9 and 14 because of the failure to provide an adequate election of the offenses.

### III.    Denial of Expert Funds

The Defendant contends that the trial court erred by denying his request for funds to hire a medical expert to rebut Dr. Westbrook's testimony.  The Defendant argues that the denial violated his rights to due process and to a fair trial.  The State responds that the trial court did not abuse its discretion by denying the request for funds because the Defendant failed to show a particularized need.  Alternatively, the State argues that any error committed by the trial court was harmless beyond a reasonable doubt.

The record reflects that on May 7, 2018, the Defendant filed an ex parte motion for funds to secure the services of a medical consultant to assist counsel's investigation and trial preparation.  The motion stated that on April 10 and 11, the State provided notice of the physicians and nurses it intended to call as witnesses "and/or expert witnesses" and provided medical records from the East Tennessee Children's Hospital, Cherokee Health Systems, and a specific therapist who had treated the victim.  The motion stated that the Defendant had been declared indigent, that he was represented by the District Public Defender's Office, and that counsel would seek to have a non-indigent client pay for "similar services."

In order to establish particularized need to warrant the authorization of funds, the motion summarized the charges in the indictment, stated that the assistance of expert services was important to protect the Defendant's due process rights by ensuring all potential defenses were investigated.  The motion stated that (1) the Defendant had been accused of various sexual offenses against a minor between February 4, 2011, and December 1, 2016, and (2) that counsel did not have adequate medical knowledge to evaluate the medical records contained in the discovery materials, to prepare a proper defense, and to cross-examine the State's medical experts without the assistance of a medical expert.  The motion stated that Dr. Randall Pedigo was an expert in the field of medicine and could provide the services needed by the defense.  Dr. Pedigo's curriculum vitae was attached to the motion.  The motion stated that counsel would comply with Tennessee Supreme Court Rule 13.  Counsel, likewise, attached an affidavit, in which counsel stated that she did not have adequate training and resources to evaluate the medical records properly in order to prepare a defense and to cross-examine the State's witnesses without the assistance of a medical doctor.

On May 17, 2018, the trial court entered an order granting the motion for funds to hire a consulting medical expert.  The court determined that the Defendant had complied with the requirements of Tennessee Supreme Court Rule 13, that he had shown a particularized need, and that the services of a medical expert were appropriate, necessary,

reasonable, and required. The court authorized $1350 and expenses. The court permitted the Defendant to petition the court for additional funds if necessary.

On June 8, 2018, a pretrial hearing was held, at which time the defense provided the trial court and the State with notice of its intention to file an ex parte motion for funds for an additional medical expert. Trial counsel explained that the motion had not yet been filed because the defense had not yet identified the expert. Counsel, however, requested a continuance from the June 26 trial date based upon Dr. Pedigo's recommendation that the defense hire a testifying medical expert.[1] Counsel advised that Dr. Pedigo concluded that the medical examination at the children's hospital was inadequate and that signs of physical trauma would have been present. The court inquired about the time between the last incident of alleged abuse and the victim's physical examination, and counsel told the court ten days. Counsel and the prosecutor agreed with the court's determination that the medical records showed that the children's hospital concluded that too much time had passed between the "discovery and the examination" to perform a "sexual assault . . . kit."

Trial counsel told the trial court that Dr. Pedigo had identified four possible testifying experts, that Dr. Pedigo had spoken with two of them, and that both concurred with Dr. Pedigo's conclusions. Counsel identified Dr. Jessica Scotchie, a pediatric gynecologist, and Dr. Darinka Mileusnic-Polchan, a forensic pathologist, as the possible expert. Counsel advised the court that the anticipated expert testimony would be that procedures could have been performed and that "more probably than not, there would have been external and internal signs of trauma." Counsel stated, too, that Dr. Pedigo determined that because an internal examination was not performed, "and there is no mention of the hymen when it could have been done to completely rule out sexual assault if it had been intact."

The prosecutor opposed the motion to continue in order for the defense to obtain an additional expert. The prosecutor argued that Dr. Pedigo's telling the defense that "they need somebody else" was insufficient for a trial continuance. The prosecutor, likewise, disagreed with the trial court's decision to provide ex parte funds to hire Dr. Pedigo because Dr. Pedigo "wouldn't be able to testify." The prosecutor said that Dr. Pedigo was an "expert that is a felon for sex offenses, and he's able to review medical records of a rape victim and give . . . an opinion basically saying that they need to hire somebody that would be proper to testify." The prosecutor discussed the impact on the victim of continuing the trial and requested that the trial proceed as scheduled, which was two weeks after the motion hearing.

---

[1] Dr. Pedigo pleaded guilty, in the 1990s, to "multiple counts of illegal dispensing of a controlled substance and sexual battery." *Pedigo v. UNUM Life Ins. Co. of Am.*, 145 F.3d 804, 806 n.1 (6th Cir. 1998).

Trial counsel responded that the trial court approved Dr. Pedigo and that counsel hired Dr. Pedigo previously in other cases because the compensation rate was lower than "anybody we could possibly get," because compensation must be approved by the Administrative Office of the Courts (AOC), and because Dr. Pedigo was available for "quickly turn[ing] these things around." Counsel noted that Dr. Pedigo's conclusions were provided to counsel less than thirty days after receiving the records and said that the defense had worked diligently. Counsel said that the additional expert sought was "important" to the defense and that prohibiting the defense from obtaining an additional expert who could testify would violate the Defendant's rights to due process and a fair trial.

The trial court inquired about possible trial dates if the court granted the defense's motion to continue. The parties noted an unspecified possible trial date in November, although a trial was scheduled for this day. Trial counsel stated that she represented the defendant scheduled for trial on the November date, that her client had been released pending trial, and that counsel did not think moving her client's trial would result in an issue. The court declined to grant the motion to continue "[a]s of right now" but stated it would "deal[] with more information as it becomes necessary."

The trial court also inquired about the State's anticipated expert witnesses at the trial. The prosecutor stated that although many expert witnesses appeared as potential witnesses, he did not anticipate calling all of them. The prosecutor said that he was waiting on "approval" to be able to call Gail Clift as a witness. The court conceded "this [was] an evolving thing" and told the defense to file its ex parte motion for expert funds quickly in order to allow time for the court to rule on the motion.

On June 18, 2018, the Defendant filed the ex parte motion to obtain funds for an additional medical expert. The motion stated that Dr. Pedigo recommended that the defense hire a testifying medical expert for the trial because Dr. Pedigo concluded that the medical examination performed on the victim was inadequate, that if the alleged sexual conduct occurred as described by the victim, "physical signs of trauma would have more probably than not existed," and that if an internal examination had been performed, "penile penetration could have been ruled out if an intact hymen were found." The motion identified the nine medical professionals for whom the State had issued subpoenas in this case and stated that the prosecutor intended to call Gail Clift from the Children's Advocacy Center as an expert witness to explain the absence of a forensic examination and the absence of the physical signs of trauma. Ms. Clift did not examine the victim. The motion stated that since learning this information, counsel had attempted to find an expert witness to "respond" to Ms. Clift's anticipated testimony. The motion stated that Ms. Clift was added as a witness "by directive filed June 12, 2018." The motion stated that after an exhaustive search, counsel had determined that Dr. Mileusnic-Polchan was a suitable witness.

In order to establish a particularized need, the motion summarized the nature of the charges, which were alleged to have occurred during a five-year time period, stated that the assistance of a testifying medical expert was necessary to protect the Defendant's due process rights and to investigate all potential defenses. The motion stated that counsel did not have adequate medical knowledge to evaluate the medical records and could not prepare a defense and cross-examine the State's witnesses without the assistance of a medical expert. The motion stated that Dr. Mileusnic-Polchan could provide the necessary services as recommended by Dr. Pedigo, that the two physicians had discussed this case, and that Dr. Mileusnic-Polchan's anticipated testimony would be that "there would have been, or should have been, some physical and observable forensic evidence of repeated sexual intercourse and/or assault if such acts had, in fact, occurred as alleged by the State." The motion, likewise, stated Dr. Mileusnic-Polchan would testify "that the failure to conduct a thorough examination by East Tennessee Children's Hospital was an error that left potentially exonerating evidence undiscovered." The motion stated that Dr. Mileusnic-Polchan was unavailable for the scheduled trial date but provided an available date that had been previously identified by the parties and the trial court as a possible trial date.

The motion stated that Dr. Mileusnic-Polchan was initially denied permission to assist in this matter by her employer, Knox County, Tennessee, which found the rate of compensation unacceptable. Dr. Mileusnic-Polchan's fee schedule was attached to the motion and estimated the cost for consultation and testimony to be $4100. The motion stated that this amount was reasonable given the seriousness of the alleged offenses and "the extreme prejudice that failure to secure this vital testimony will have on [the Defendant's] ability to adequately defend himself." The motion stated that counsel was aware of the maximum rate of $250 per hour and that the defense could not secure this vital evaluation and testimony through any other means. The motion requested that the trial court authorize the maximum allowable amount of compensation and stated that counsel's office would accept the financial responsibility of the remaining cost. The motion stated that the District Public Defender's Office had never offered to supplement a fee previously and that the office was willing to do everything to secure this vital and material witness for the trial because of the extraordinary need. The motion stated that if the State were permitted to rely on expert medical testimony regarding the sufficiency of the physical examination of the victim in the case-in-chief, the Defendant had the "right to respond with at least competent and effective assistance of counsel in cross-examination and rebuttal proof, if such proof is available." The motion stated that the relevant proof was available and that it had to be obtained through adequate funding by court order.

On June 19, 2018, an ex parte hearing was held on the motion for expert funds. Trial counsel noted that since the June 8 hearing, the State filed "a directive" on June 12 that it intended to call Gail Clift as an expert witness relative to the victim's physical examination. Counsel noted that although Dr. Pedigo had "a very troubled past" and was "not a suitable person to call as a witness," Dr. Pedigo was "a good resource at a much reduced rate" for

reviewing medical records, which counsel described as the "limit" of Dr. Pedigo's function. Counsel said Dr. Mileusnic-Polchan shared Dr. Pedigo's conclusion that "the medical examination that's described in the records was not sufficient." Counsel noted that Dr. Mileusnic-Polchan was unavailable for the scheduled trial date because she was under the authority of a subpoena to testified in another county.

Trial counsel stated that he had not discussed this case at any length with Dr. Mileusnic-Polchan because counsel wanted Dr. Mileusnic-Polchan to make an independent evaluation of the records without any influence from counsel. Counsel noted that initially, Dr. Mileusnic-Polchan said her employer, Knox County, would not approve of the compensation amount of $250 per hour set by the AOC. Counsel said that after he learned this, he contacted other people who had testified previously for the Public Defenders' Conference and that counsel had been unable to locate anyone else who could testify at the trial. Counsel requested the trial court to approve the $250 per hour maximum fee allowed by the AOC and said his office would pay the remainder of Dr. Mileusnic-Polchan's fee. Counsel stated that he had received approval to pay the fee from his "local budget."

The trial court inquired about the defense's particularized need and whether Dr. Mileusnic-Polchan's anticipated testimony would be that the physical examination "was suspect." Counsel confirmed this was the anticipated testimony and said the expert would rebut the anticipated testimony of the State's expert Ms. Clift. The court asked, "What makes the State think they can get her in" as a trial witness, and counsel responded, "Frankly, I don't know. I mean, that's another issue . . . ." The court stated the following:

> Well -- but it is the issue. I mean, I'm not gonna start throwing money at an issue that's not even gonna come in. There are . . . hearsay issues. The fact that a doctor examined someone, if that doctor is not here in Court and they try to use Dr. Mileusnic to get that in, there's confrontation issues and hearsay issues.
>
> . . . .
>
> . . . I don't know how this case is gonna turn out. I don't -- no one has posed that to me, but it's a little – presumptuous for anyone to think that you can just throw a doctor up there and use another doctor's statements for a jury because you – no one is getting to confront the declarant. There . . . might be a business records rule that gets in, but that doctor . . . testifying can't really give an opinion based upon what another doctor said unless they have got some sort of information. They you've got your client . . . his right to confront the declarant.
>
> . . . .

-25-

. . . I have let [Dr.] Pedigo help because -- and my main concern is to allow you some medical knowledge to help with the examination with, you know, to explain terms. . . .

. . . .

It's more of an advisory role. I consider this move a bit of a red herring that Dr. Pedigo . . . really had no standing to start. I want him to help you because you're not a doctor . . . , but to begin playing, you know, back door lawyer on what needs to be filed, that's out of line. I know he was a forensic pathologist, . . . but in my opinion he's stepping over the line when he starts this line of recommendation. And he's -- I bet he's not thought the first thing about confrontation. He's not thought the first thing about hearsay. It's just get you a doctor that will say that this doctor didn't do it right. That's not what this trial is about. And you can effectively -- cross-examine in ways that another physician who had limited, if any, information would get up and – that's where I step in as the [gatekeeper] on relevance. And I mean, you all are clearly thinking about many angles on this case, but some of the angles in mind are headed toward inadmissibility. I don't know that I would let the State offer Ms. Clift just to get up there and read somebody's records. . . .

Trial counsel responded that he anticipated Ms. Clift's testimony would be as an expert, which would allow her to provide testimony that "oftentimes in these types of cases, there are no physical signs so there is . . . no problem with the fact that Children's Hospital didn't do a physical examination of [the victim]. But that's nothing the jury should concern themselves with." Counsel argued that Ms. Clift's anticipated testimony was "somewhat speculative" and that the defense would not be able to effectively respond to that other than just on cross-examination say, well . . . isn't that not true and then, you know, so."

The trial court denied the request for ex parte funds and said,

[B]ut not necessarily because of the money, but I'm -- through the *Barnett* review – I've looked at it again today – I'm not seeing a particularized need in that if what I suspect is the case -- first of all, again, . . . the Pedigo progeny concerns me. It is somewhat speculative. It takes -- you know, we're talking experts upon experts upon experts about the investigation of the case. We can go . . . to Antarctica on that one, and I'm just basically drawing a line because I'm not seeing a particularized need.

. . . .

-26-

And second, I'm not sure how the State intends -- let's say that . . . if Dr. Mileusnic was your witness in response to Gail Clift, or she's the one that started the Gail Clift analysis which is an expert saying Dr. "X" should have done something, then Gail Clift gets up there and says Dr. "X" for not doing something did not do anything wrong.

. . . .

I mean, that's kind of the logical progression. I think if -- allowing an expert to step in at any level to talk about what occurred and what didn't occur in my mind is confusing to a jury, it is . . . something of a waste of time, and [counsel] . . . can effectively cross either through treatises. I don't know if there is any . . . .

Trial counsel informed the court that the entry in the medical records at issue was that an internal examination was not performed "because it had been ten days since the alleged abuse." The court inquired about whether the defense's proposed expert would testify that during this "time window," there could have been something detected, and counsel agreed, adding that something could have been detected because the allegation was "sustained sexual contact that happened over a period of years," and that as a result, within a degree of medical certainty, there would have been physical evidence.

Trial counsel clarified for the trial court that Dr. Pedigo thought there would have been physical evidence after ten days and that, based on this conclusion, counsel spoke to two other physicians, who agreed there would have been physical evidence. The court stated that it "may be a valid opinion and it gives [counsel] something to work on, but the expenditure of funds and drawing [another] doctor and you're declaring an expert for that purpose of that is over the line in my mind. That can be done through effective cross-examination."

The trial court, again, denied the ex parte motion for funds and stated as follows:

The money is of less concern than the showing of particularized need, and I frankly think that I'm gonna . . . challenge you all to be on guard for inadmissible hearsay confrontation issues involving witnesses that don't know anything about this case, and throwing somebody up there and declaring them an expert and letting them testify from the records that they don't – they aren't privy to is constitutionally suspect. . . .

At a June 25, 2018 pretrial motion hearing, the defense submitted to the trial court a subsequent ex parte motion for expert funds. When the trial court inquired about what had changed since the June 19 ex parte hearing, trial counsel stated that the showing for

particularized need had been modified to reflect that Dr. Mileusnic-Polchan was a necessary medical expert witness for the Defendant's case-in-chief, although expert testimony might include rebuttal evidence. Counsel stated that, based upon further review of the medical records, the defense believed there might have been an "actual issue" to raise as part of the defense. Counsel said that without expert testimony, the defense would be unable to present the issue to the jury.

The trial court cleared the courtroom in order to hold an ex parte hearing on the motion. Trial counsel explained that if the State called an expert witness who would testify that the failure to perform an internal examination was "not uncommon" because ten days had elapsed since the last alleged incident of abuse and because it was common for a person not to have a physical injury from sexual assault, the defense would present an expert to refute this evidence. Counsel said that in this scenario, the defense expert would testify that, based upon the extended period during which sexual incidents were alleged to have occurred when the victim was between ages five and ten, an internal medical examination would have shown a "different sort of long term trauma or damage that would have possibly or probably been noticeable."

Trial counsel explained that if the State presented evidence showing that the Defendant and the victim had sexual contact beginning when the victim was age five and continued until she was ten but that the State chose not to present an expert, the defense would present an expert to explain that if this were true, "there would have been observable physical evidence as vitally important to the Defendant because it directly refutes a big part of the State's contention here, which is that this was regular, ongoing physical abuse, full on sexual intercourse contact that had been happening for five years." Counsel said that he would be ineffective if he did not present this evidence to the jury and that the Defendant would be denied his right to present a defense. Counsel said that he could not present this evidence by any other means. Counsel argued that the expert testimony would establish that a physical examination would have been helpful to determining the victim's credibility and to determining whether the allegations were "more likely than not true."

The trial court asked whether the defense was to "put[] the investigation on trial," and trial counsel said that "it becomes an issue." Counsel agreed with the court that "it becomes an element of the offense." Counsel explained that the defense was that "these things . . . did not happen the way the State would present them to have happened." Counsel said that as a result, the defense needed "the ability to bring proof to say that if it had happened the way the State says it happened, . . . a proper examination would have . . . made that more clear[.]"

The trial court said that it now understood "where [the defense was] going with it." Trial counsel said that the motion for a continuance had been filed contemporaneously with the ex parte motion for funds because Dr. Mileusnic-Polchan could not appear on the

-28-

scheduled trial date. However, the court determined that the defense had still failed to establish particularized need. The court said,

"[H]ow far would any Court allow this sort of thing to go in the form of expert testimony? I mean, that's what it is. . . . [W]e're talking about experts who are looking at other reports and making determinations. They've never laid eyes on the victim, they have never had any real privy to this case other than poking holes at what one side or the other is going to prove. . . . And part of my job is to make sure the issues don't get confused . . . and the jury is not going to run amuck on, you know, challenging – using experts. That's a difference. We're talking about effective cross-examination and points being made about why evidence doesn't exist. . . . When does it help the jury? I'm not convinced that any of this does.

After a recess, the trial court determined that the defense had failed to show a particularized need for funds. The court found that Dr. Mileusnic-Polchan's testimony, without having any more information than had been presented, "would be speculative at best, and I'm not even sure that she would be competent to give that kind of testimony."

Immediately following the ex parte hearing, the pretrial hearing resumed. The prosecutor stated that he did not intend to call Ms. Clift in the State's case-in-chief, only as a rebuttal witness. The trial court stated that although it did not intend to address issues raised in an ex parte hearing, it wanted to inform the parties that expert opinion testimony that does not

help the jury decide something that they are called upon to do, I mean, I'm gonna be on guard for that. I think we need to try this with factual testimony and then logical explanations of why things exist and why things do not exist rather than get into opinions that any one of us could have . . . , and you all can effectively cross-examine many of the witnesses that bring that sort of vague testimony, or maybe vague is not the right word -- testimony that is subject to multiple nuances. . . .

Tennessee Supreme Court Rule 13, section 5 states, in relevant part,

(a)(1) In the trial . . . of all criminal cases in which the defendant is entitled to appointed counsel . . . , the court, in an *ex parte* hearing, may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected. If such determination is made, the court may grant prior authorization for these necessary services in a reasonable amount to be determined by the court. . . .

. . . .

(b)(4) If the motion satisfies [the] threshold requirements, the trial court must conduct an *ex parte* hearing on the motion and determine if the requested services are necessary to ensure the protection of the defendant's constitutional rights.

. . . .

(c)(1) Funding shall be authorized only if, after conducting a hearing on the motion, the court determines that there is a particularized need for the requested services and that the hourly rate charged for the services is reasonable in that it is comparable to rates charged for similar services.

(c)(2) Particularized need in the context of criminal trials and appeals is established when a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial.

In order to "establish particularized need, [a] defendant must show that . . . [an] expert is necessary to protect his right to a fair trial. Unsupported assertions that [an] . . . expert is necessary to counter the State's proof are not sufficient. *State v. Barnett*, 909 S.W.2d 423, 431 (Tenn. 1995). A defendant "must show that 'there is a reasonable likelihood that [the assistance] will materially assist [him or her] in the preparation'" of the trial. *Id*. at 430. A defendant "must demonstrate by reference to the facts and circumstances of his particular case that" an expert is necessary to ensure a fair trial. *Id*. at 431. In determining whether a defendant has established a particularized need, trial courts "should consider all facts and circumstances known to it at the time the motion is made." *Id*. A trial court's decision to deny an ex parte request for an expert is reviewed for an abuse of discretion and will be upheld on appeal unless "the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the complaining party." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000). A trial court's abuse of discretion "amounts to a denial of process," and therefore, is subject to the constitutional harmless error standard. *Id*. at 755.

The record reflects that the trial court granted the defense's ex parte motion for securing a consulting medical expert to review and to evaluate the victim's medical records. After reviewing those records, the consulting expert concluded that the medical examination performed on the victim was inadequate, that if the alleged sexual conduct occurred as described by the victim, "physical signs of trauma would have more probably

-30-

than not existed," and that if an internal examination had been performed, "penile penetration could have been ruled out if an intact hymen were found."

The consulting expert, as a convicted felon, was unable to testify, and the record reflects that the parties and the trial court were aware of the approved expert's status before the court approved the ex parte motion for expert funds. The defense explained that the expert was selected in this case, and in many others cases and with the trial court's approval, because of the expert's reduced rate, availability for consultation, and ability to provide medical conclusions quickly. The expert concluded that the medical examination performed on the victim had been inadequate, that if the alleged sexual conduct had occurred as described by the victim, "physical signs of trauma would have more probably than not existed," and that if an internal examination had been performed, "penile penetration could have been ruled out if an intact hymen were found." Before the June 18 ex parte motion was filed, the State had provided notice to the defense that it had issued subpoenas for nine medical professionals, and although the defense was uncertain before the trial, the defense anticipated that Gail Clift would testify as an expert about the absence of an internal examination and the absence of physical signs of trauma. We note that ultimately, Ms. Clift did not testify at the trial. Rather, Dr. Westbrook, who examined the victim at the children's hospital, testified as a medical expert in the State's case-in-chief and provided testimony about the absence of an internal examination and of signs of trauma. She likewise testified that she saw the hymen during her examination.

The consulting expert identified four potential testifying experts, two of whom the consulting expert had discussed this case and had agreed with his conclusions. The defense ultimately sought to hire Dr. Mileusnic-Polchan, who after discussing this case with the consulting expert, concluded that "there would have been, or should have been, some physical and observable forensic evidence of repeated sexual intercourse and/or assault if such acts had, in fact, occurred as alleged by the State." Likewise, Dr. Mileusnic-Polchan concluded that the failure to conduct a thorough examination of the victim "was an error that left potentially exonerating evidence undiscovered."

The defense made clear, especially at the final ex parte motion hearing, that Dr. Mileusnic-Polchan's testimony was necessary to present a defense in two possible scenarios, depending upon how the State addressed the issues connected to the medical examination at the trial. If the State elected to present a medical expert to testify that the failure to perform an internal examination was "not uncommon" because ten days had elapsed since the last alleged incident of abuse and because it was common for a person not to have a physical injury from sexual assault, the defense would present Dr. Mileusnic-Polchan, who would testify that, based upon the extended period of penile-vaginal intercourse when the victim was between the ages five and ten, an internal medical examination would have shown a "different sort of long term trauma or damage that would have possibly or probably been noticeable." This anticipated testimony would have

contradicted Dr. Westbrook's testimony that an internal examination was unnecessary because she did not observe any trauma during the external examination. She testified that she rarely found signs of trauma after a disclosure of sexual abuse and that the likelihood of observing trauma after twenty-four to seventy-two hours after an incident of abuse was "slim." She further opined that if a person reported engaging in sexual intercourse between ages five and eleven, she would not have expected to observe evidence of trauma in the majority of cases.

Furthermore, trial counsel explained to the trial court that if the trial evidence showed that the Defendant and the victim had sexual contact beginning when the victim was age five and continued until she was ten and the State chose not to present an expert to testify about the examination and lack of signs of abuse, the defense would present Dr. Mileusnic-Polchan to explain that if the allegations of prolonged sexual intercourse between the victim and the Defendant were true, there would have been observable physical evidence vitally important to refuting the State's contentions and theory of the case and to present a defense. Counsel explained that counsel could not present this evidence by any other means and that the evidence was relevant to determining victim's credibility and to determining whether the allegations were "more likely than not true." Counsel told the court that the defense theory was that "these things . . . did not happen the way the State would present them to have happened" and that, as a result, the defense needed the ability to present evidence showing that if the State's allegations were accurate, a proper examination would have "made that more clear[.]"

We conclude that the trial court erred in its determination that the defense failed to establish a particularized need warranting the release of funds to hire an additional medical expert. The defense sufficiently established, based upon the facts of the case, that medical expert testimony was necessary to challenge the adequacy of the victim's physical examination, what an internal examination would have likely shown if it had been performed, and to challenge Dr. Westbrook's opinions and conclusions. The defense provided the substance of the anticipated expert testimony and established that expert testimony was necessary to challenge the State's theory of the case that the victim had suffered prolonged sexual abuse between the ages of five and ten. In essence, the expert testimony was critical to the Defendant's ability to present a defense showing that evidence did not support the State's allegations of prolonged sexual abuse. The defense likewise established that the basis for the requested expert was related to factual matters for the jury's determination and did not fall within trial counsel's capability and expertise. *See* Tenn. R. Sup. Ct. 13, § 5 (c)(2), (4).

In reaching this conclusion, we have considered trial court's focus, at least in part, on the ten days between the last incident of abuse and the examination, in which a defense expert might have testified that acute physical injury could have been observed. However, the material issue for which the defense sought a testifying expert was not whether any

injury from the last incident of abuse would have been observable ten days later. The material issue for which the defense sought an expert was to show that if the sexual abuse occurred as alleged in the indictment and the bill of particulars, in that sustained penile-vaginal intercourse occurred between a young child and an adult male for five years, an internal examination would have shown physical, observable evidence in some fashion. Whether an injury would have been visible days after the last incident of sexual contact was irrelevant to establishing particularized need in this case.

We have likewise considered the trial court's determination that although the consulting and testifying experts' conclusions might have been "valid," the "expenditure of funds is over the line in my mind" because effective cross-examination would be sufficient. The burden for establishing a particularized need is a showing of a reasonable likelihood the assistance of an expert will materially assist with trial and defense preparation. The defense met its burden in this regard, and the trial court erred in determining otherwise.

Furthermore, the trial court expressed significant concern about confrontation and hearsay issues associated with medical expert testimony, generally. We question the trial court's concern that hearsay and confrontation issues arise when a medical expert reviews records and provides an expert opinion about the adequacy of a physical examination of an alleged rape victim and about what an internal examination would have shown if a victim, between the ages of five and ten, and an adult man had engaged in five years of repeated penile-vaginal intercourse. *See* Tenn. R. Evid. 702, 703. The court "challenged" the parties to "be on guard for inadmissible hearsay confrontation issues involving witnesses that don't know anything about this case" because it was "constitutionally suspect." Likewise, the court effectively warned the parties not to present expert witnesses who did not have direct knowledge of this case.

As a result, we conclude that the trial court abused its discretion by denying the ex parte motion for funds to hire an additional medical expert. We conclude, though, that the error was harmless beyond a reasonable doubt. The purpose of the medical expert was to challenge the State's allegations of prolonged sexual abuse and the victim's credibility, generally. Although the jury convicted the Defendant of offenses connected to the three incidents of abuse occurring shortly before the victim's disclosure, the jury acquitted him of the incidents alleged to have occurred years earlier. Likewise, the Defendant's statement to Detective Summers, in which the Defendant described a single incident of sexual contact near the time of the victim's disclosure, provided the jury a means to assess the victim's credibility in connection with the incidents resulting in the convictions. Therefore, we conclude that the Defendant is not entitled to relief on this basis.

## IV.    Consecutive Sentencing

The Defendant contends that the trial court erred by ordering consecutive service of his sentences because the court relied upon the alleged conduct in the indictment counts for which he was acquitted.  He argues that the conviction offenses occurred within days of the disclosure, that the jury acquitted him of the conduct alleged to have occurred years before the victim's disclosure, and that, as a result, the court's basis for imposing consecutive service was improper.  The State responds that the imposition of consecutive service was based upon the court's finding that the Defendant had been convicted of two or more offenses involving the sexual abuse of a minor.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2018).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07.  "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706.  "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences.  *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013).  A trial court has broad discretion in determining whether to impose consecutive service.  *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019).  In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which

the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

At the sentencing hearing, the presentence report was received as an exhibit. The report reflects that the fifty-eight-year-old Defendant had previous convictions for six counts of driving under the influence, three counts of driving while his license was suspended, public intoxication, violating the financial responsibility law, and an undisclosed offense in Florida. The parties agreed that the Defendant did not have previous felony convictions. The Defendant reported truancy matters as a juvenile. The Defendant reported membership in the motorcycle gang known as "The Outlaws." The Defendant stated that he began as a "prospect," learned martial arts, and "shipped a lot of drugs out of . . . Florida." The Defendant said that he left the gang before a "war" with a rival gang occurred and that he fled Florida before anyone in the gang realized he had left.

The Defendant reported having an eighth-grade education and stated he left school to find employment to support to his family. He reported having clinical depression since 1993 and having attempted suicide by intentionally crashing a race car at 146 miles per hour after the death of his wife. The Defendant reported self-medicating with pain medication, alcohol, and illegal drugs. He reported marijuana use throughout adulthood and drinking alcohol beginning at age nine. He reported mental health treatment in Chattanooga after attempting suicide a second time by cutting his wrists. He reported medical conditions related to his heart, back, and hip as a result of the race car crash. He reported having a heart attack in 2014 or 2015 and having seizures resulting from a "brain bleed" in 2014. He reported taking more than thirty prescription medications while in confinement and noted that marijuana helped control his seizures. The presentence report reflects that the Defendant's mental health records supported the Defendant's statements to the presentence investigator. The Defendant reported sporadic employment beginning at age thirteen and stated that he began receiving Social Security disability benefits in 2013 after the race car crash, heart attack, and "brain bleed."

The victim told the presentence investigator that she had endured pain during the incidents involving vaginal penetration and that she had been emotionally scarred, had extreme anxiety, and had become "standoffish." The victim stated that she suffered from depression, distrusted people, disliked crowds, and had difficulty making friends. The victim reported having received counseling for one-and-one-half years and said she would continue to receive counseling until her therapist concluded she was "more confident and comfortable with others." The victim said that the abuse had "destroyed" her life and that her family felt guilt, anger, and hate. She said that although the abuse made her "strong in a way," it "destroyed" her mental health.

The presentence report reflects that during the Strong-R risk assessment interview, the Defendant stated that the victim "said I was asleep and she woke me up and we had

sex" and that it "only happened one time." Regarding aggression and anger management, the Defendant stated that he previously went to bars for the purposes of "beating people" and that everyone at the jail knew he would "take physical action . . . if he was physically touched." The report reflects the victim corroborated the Defendant's aggression and cites the victim's forensic interview, in which she stated that she had to protect herself and that the Defendant had previously struck her and her sister. The Defendant received a score of "high-violent."

The psychosexual risk assessment reflects that the Defendant initially denied any sexual contact with the victim but ultimately stated that the only incident occurred as described in his police statement. The Defendant blamed the victim for the sexual contact, and the interviewer concluded that the Defendant's version of events was "suspect." The Defendant appeared to function within the "Low-Average Range of Intelligence." The interviewer concluded that the Defendant had a moderate range of risk of recidivism and had a low-moderate risk to act out sexually with the appropriate treatment.

The prosecutor read the victim's prepared written statement to the trial court, which stated as follows:

> Rick, my life has forever changed. After my fifth birthday, you took my childhood, and it made me grow up quickly in an environment that no child should have to endure. You made me call you Dad all while not behaving like a true father should. You make me sad, depressed, scared or withdrawn.

> I still remember the first time you raped me. You then proceeded to continue for over five years. The thoughts of what you did to me make me burst out into tears at random times. My life is now forever altered. Because of you, I get depressed and makes me cut off the people who care about me the most. I can't get a full night's sleep because every tiny noise triggers and startles me. I have severe anxiety which has made me unable to be a child. I can't be around groups of people, and I trust no one. I used to be a fun loving child before you, Rick.

> For years, I thought you should have -- for years, I'm sure you thought you had won, but let me be the first to assure you that I am the winner in all of this. While I know you thought -- while I know the thought will be with me forever, I will continue to focus on my well being and my mental health which will help me be the ultimate winner when I grow up and prosper.

> I know sometimes bad things happen to us so we can help others. I know one day I will be a successful adult who will get to help other children

who have endured this.  But for you, Rick, this is the end.  You will hopefully be locked up where you can never touch another child.

. . . I want to go back to how this all started.  Rick, do you remember when I said my life is forever changed?  And now yours has, too, and I know at the end of this struggle, I am the triumphant one.

The Defendant elected to present no evidence.

The trial court determined, based upon the jury's verdicts, that the jury acquitted the Defendant of all the counts that were not "somehow . . . associated" with the Defendant's police statement.

The trial court considered but declined to apply any mitigating factors.  *See* T.C.A. § 40-35-113 (2018).  The trial court applied three enhancement factors.  *See id*. § 40-35-114 (2018).  The court applied factor (1) based upon the Defendant's previous misdemeanor convictions.  *See id*. § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]").  The court applied factor (7) based upon the trial evidence regarding the incidents of sexual abuse.  *See id*. § 40-35-114(7) ("The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement[.]").  The court applied factor (14) after determining that the Defendant committed the offenses "by virtue of his seemingly parental persona in this relationship."  *See id*. § 40-35-114(14) ("The defendant abused a position of . . . private trust . . . that facilitated the commission or the fulfillment of the offense[.]").

After weighing the enhancement factors, the trial court determined that for purposes of the three rape of a child convictions, the Defendant was a Range II offender pursuant to Code section 39-13-522(b)(2)(A) (2018) and faced sentences of twenty-five to forty years for this Class A felony.  The court imposed twenty-five-year sentences, which were to be served at 100%.  *See id*. § 40-35-501(i)(1)(I) (2018).  Relative to the two convictions for aggravated sexual battery, the court determined that the Defendant was a Range I, standard offender and faced sentences of eight to twelve years for this Class B felony.  The court imposed sentences of ten years for each conviction at 100% service.  *See id*. § 40-35-501(i)(1), (i)(2)(H) (2018) (mandating 100% service for convictions of aggravated sexual battery).

Relative to consecutive service, the trial court determined that the trial evidence supported consecutive service "all the way through," for an effective sentence of ninety-five years at 100% service.  The court stated, "[T]hese types of crimes are bone chilling to have children go through the things that they go through at the hands of someone they're supposed to trust.  And this Court is simply not [going to] allow it without some sort of

push back." Although the court considered the victim impact statement, the court determined consecutive service was warranted because the Defendant had been convicted of two or more offenses involving sexual abuse of a minor with consideration of the aggravated circumstances arising from the relationship between the Defendant and the victim, the time span of the undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual physical or mental damage to the victim. *See id*. § 40-35-115(b)(5) (2018). The court stated that its decision to impose consecutive service on this basis was a result of the trial evidence, the presentence investigation, and the Defendant's previous conduct and character. The court noted that sexual offenses were becoming "more and more of a concern" for society, generally, in that these types of crimes were "carried out in silence in the dark" and that "wrongdoers need to be dealt with in a fashion such as this." The court determined that the Defendant had engaged in "very specific and horrendous actions."

The record reflects that the trial court's imposition of the consecutive service was based upon the Defendant's convictions for two or more offenses involving sexual abuse of a minor with consideration of the aggravated circumstances arising from the relationship between the Defendant and the victim, the time span of the undetected sexual activity, the nature and scope of the sexual acts, and the extent of the residual physical or mental damage to the victim. *See id*. § 40-35-115(b)(5). The record reflects that the Defendant was convicted of five sexual offenses against the victim that occurred during a two-day period. The trial evidence established the nature and scope of the sexual acts. The Defendant acted as a parental figure charged with her care when the offenses occurred, and the victim impact statement, along with the victim's statement read into the record at the sentencing hearing, discussed the extent of the residual mental damage the Defendant had caused the victim. The victim stated that she had been emotionally scarred and that the abuse destroyed her life and mental health. She suffered from anxiety and depression and had difficulty making friends. Likewise, the victim had received counseling for one-and-one-half years, and her therapy would continue indefinitely.

Regarding the time span of the undetected sexual activity, the trial court noted that the jury had acquitted the Defendant of the charges stemming from conduct occurring before the two-day period in which the victim was home from school. The defense requested that the court clarify the time frame of the undetected sexual activity, and the court stated, "We're talking what, two weeks, but it was an area of time that the defendant exploited and it took awhile for it to be exposed, or at least some time[.]" The record reflects that about one week after the three incidents for which the Defendant was convicted, the victim disclosed the abuse to her mother. As a result, we conclude that the record does not reflect that the trial court considered the evidence at the trial relative to incidents for which the Defendant was not convicted. The record reflects, rather, that the court considered the time between the date of the conviction offenses and the victim's disclosure.

Furthermore, we conclude that the trial court did not abuse its discretion by imposing consecutive sentencing on the basis of Tennessee Code Annotated section 40-35-115(b)(5), based upon the Defendant's having committed two or more offenses involving sexual abuse of a minor. Although the abuse for which the Defendant was convicted occurred during a two-day time period and the disclosure was made approximately one week later, the nature of the sexual abuse speaks for itself. Furthermore, "not all of the aggravating circumstances listed in section 40-35-115(b)(5) 'must be present to support the imposition of consecutive sentencing.'" *State v. Allen Doane*, 393 S.W.3d 721, 738 (Tenn. 2011) (quoting *State v. James M. Powers*, No. E2001-02363-CCA-R3-CD, 2002 WL 31387308, at *5 n.4 (Tenn. Crim. App. Oct. 23, 2002)). As a result, the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the Defendant's convictions for three counts of rape of a child are affirmed. The Defendant's convictions for aggravated sexual battery are reversed, and the case is remanded to the trial court for a new trial on the aggravated sexual battery charges, at which time the State shall make a proper election of the offenses and the trial court shall instruct the jury consistent with the State's election and the evidence adduced at a trial.

_____
ROBERT H. MONTGOMERY, JR., JUDGE